John B. Math, Administrator, Appellee, v. Chicago City Railway Company, Appellant.

Gen. No. 14,513.

1. PASSENGER AND CARRIER—*what not contributory negligence.* A passenger standing upon a car in a place such as upon a step, foot-board or platform is not guilty of contributory negligence as a matter of law.

2. PASSENGER AND CARRIER—*what does not affect relation.* If a person takes a position of danger upon an overcrowded car and the carrier accepts his fare, the status of such person as a passenger is not affected by a formal remonstrance made by such carrier to such passenger retaining his position of danger.

3. PASSENGER AND CARRIER—*what not contributory negligence.* A passenger even though he may assume a place of danger is **not** guilty of contributory negligence which will bar his recovery **if**

his negligence does not contribute to the particular result occasioned by the negligence of the carrier.

4. NEGLIGENCE—*operation of overcrowded car.* Both on principle and on authority the operation of an overcrowded car is *prima facie* an act of negligence.

5. EVIDENCE—*when impeaching foundation sufficient.* If the questions put to a witness sought to be impeached embodied substantially the varying statements claimed to have been made, the foundation is sufficiently laid.

6. NEW TRIALS—*what essential to granting.* To induce the granting of a new trial on review there should be strong probable grounds to believe that the merits of the case have not been fully and fairly tried and that injustice has been done.

7. VERDICTS—*failure to render judgment upon.* If the verdict is in favor of one defendant and against another, it is error to fail to render judgment with respect to both such defendants; *held,* however, in this case, that such error was harmless.

Action in case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1908. Affirmed. Opinion filed May 11, 1909.

**Statement by the Court.** John B. Math, administrator of the estate of Charles A. Rietzel, deceased, in August, 1903, brought suit in the Superior Court of Cook county against the Chicago City Railway Company to recover damages for having by its carelessness and negligence caused the death of Rietzel. Originally plaintiff had impleaded, with the Railway Company, the Joseph Stockton Forwarding & Transfer Company and the Joseph Stockton Company, but by amendment Joseph Stockton & Company was made the only joint defendant with the Railway Company. A trial was had in December, 1902, and a verdict returned finding Joseph Stockton & Company not guilty and the Railway Company guilty with damages assessed at $5000. In January, 1903, plaintiff remitted $1200, whereupon the court overruled a motion for a new trial and rendered judgment against the Railway Company for $3800. The Company appealed from this judgment. In June, 1904, the Appellate Court reversed the judgment because of the use, by appellee's attorney, of improper and in-

flammatory language, calculated to arouse in the jury passion and prejudice against the appellant, and for error in the giving of an instruction. Chicago City Railway Company v. Math, 114 Ill. App. 350.

As appellee made no motion for a new trial, as to Stockton & Company, that defendant has not been in the case since the judgment was entered in the Superior Court, in January, 1903.

In May, 1907, the case was again heard before a jury, as between the plaintiff and the Railway Company, and a verdict was again rendered against the Company for $5000. Upon this verdict a judgment was rendered on January 25, 1908. From that judgment appellant, the Railway Company, prosecutes this appeal.

Another case, involving an injury to another person upon precisely the same state of facts, arose out of the same occurrence and was before this court in Chicago City Railway Company v. Schaefer, 121 Ill. App. 334.

The Railway Company operates a double track street railway in Chicago, on Clark street, a north and south street, which railway runs both north and south of Fourteenth street, an east and west street. The street cars are operated by electricity and a trolley. Fourteenth street runs into Clark street from the east and stops at Clark street. On the west side of Clark street is a brick wall about eight feet high. At Fourteenth street the Company's tracks are laid at the extreme west side of Clark street, over against the brick wall, so close that there is scant room for a person to get out of a southbound car and stand between it and the wall. The southbound cars run on the west track and the northbound cars on the east track. Between the east rail of the two tracks and the east curbstone there is a roadway space of eighteen feet. The Erie Railway freight office building is on the southeast corner of Clark and Fourteenth. The building stands out to the sidewalk on Clark street for a distance of fifty

feet, from Fourteenth street south, and from that point, for a further distance of about fifty feet south, which is the extent of the building, there is a jog arising from that part of the building being set back twenty-five feet from Clark street. The part of the building standing out to Clark street is four stories high and the other part is two stories high. Adjoining the building to the south are railway freight sheds which also stand back and extend south some hundred feet. At the time of the occurrence here in question the street space eighteen feet in width, as well as the area adjacent to the street, south of the jog in the building, was all level and well paved with granite block pavement up to the doors of the freight sheds.

About one o'clock in the middle of the day, on July 2, 1901, a bright and hot summer day, the open trolley car of the street car company, in connection with which this controversy arose, came from the south toward Fourteenth street. The car had seats running all the way across the car and so placed that two seats or benches faced each other; consequently there was no aisle lengthwise in the car. There were foot-boards on each side of the car. There is a square conflict in the evidence whether the body of the car was so filled with passengers that there were no vacant seats therein. On the one side witnesses testified that all the seats were occupied, and on the other side witnesses testified that there were vacant seats in the car. It is undisputed that some persons were standing upon the foot-board on the east side of the car. Among those so standing were two boys about fourteen years of age: the decedent, Charles A. Rietzel, who stood at the first upright post, or stanchion, from the front, and John Schaefer, his friend, who was with him and stood at the second stanchion from the front. These boys had taken the car some considerable distance from the place we have described and stood on the foot-board the whole time until they were brushed off, as will appear later. The fares for both were paid by Rietzel,

when the conductor came to collect them. The conductor testified that when he collected the fares he asked the boys to step inside and take seats but received no reply. No street runs west from Clark street between Twelfth street on the north and Eighteenth street on the south and, consequently, there is no travel across Clark street between those points. There is no dispute but what the trolley car came along at a pretty good rate of speed, ten to twelve miles per hour. When the car approached Fourteenth street, a large truck wagon, hauled by two horses, came from the east on Fourteenth street and turned south into Clark street. The truck was empty and came along with the horses on a trot. It belonged to Joseph Stockton & Company and its destination was a door of the freight shed located about three hundred feet south of the office building. There was no other train or wagon in the street at the time nor was there anything else to obstruct the view. The motorman in charge of the trolley car testified that the car was about two hundred and forty feet distant from the team after the team had "straightened out on Clark street coming south." The car continued without lessening its speed until it slowed up in stopping and it stopped about twenty-five feet north of Fourteenth street. The witnesses of the plaintiff and defendant conflict squarely as to the manner in which Rietzel was knocked off the footboard and as to where the teamster was driving as he approached and passed the car. Rietzel and his companion Schaefer were scraped off the foot-board by the corner of the truck which, at the same time, nicked, somewhat, the projecting metal handle of the front stanchion of the car. Rietzel was so injured that he died three days later. Unquestionably, had there been no carelessness on the part of the motorman or on the part of the teamster, Rietzel would not have been killed. It is but natural that the witnesses should, as they do, differ regarding the precise distance south of Fourteenth street at which the car and

the truck came in contact. It appears to us, however, that that point was about sixty to one hundred feet south of the south line of Fourteenth street. The witnesses, on behalf of the company, who testify on the subject, say, that at no time before reaching the car or while passing it, until the truck was turned toward the east, did the truck come within from three to six feet of the easternmost rail of the car tracks, variously estimated, and the company's theory is, that, as the truck turned to go to the Erie freight sheds, when the horses were turning toward the southeast, while the nearest part of the truck was about three feet from the street car tracks, the wheels began to slide and slid toward the car and thus the boys were knocked off. And, the company contends that this would not have happened if the boys had not stood upon the foot-board. A witness for the company, W. B. Smith, presents this view of the occurrence most clearly. On the other hand the witnesses for plaintiff, including the teamster himself, testify that at no time, while the teamster was driving, straight south on Clark street and before he turned out of the track, in front of the car, was the truck wholly east of the east rail of the car tracks. In substance, these witnesses say that the truck came along with the horses on a trot and its two west wheels within the east track; that as the teamster made the turn in front of the car, to go east or southeast to the freight shed, his west wheels dragged for quite a distance before the front wheel came out of the east rail and thereafter the hind wheel dragged, but both wheels were out and the wagon nearly clear of the car, as the car passed and the collision occurred. There is a conflict in the testimony of these witnesses whether the metal handle outside of the first stanchion or the dashboard of the car first came in contact with the wagon. The theory is that both the teamster and the motorman in approaching one another, as the team was turning out toward the freight shed, continued their rate of speed too long and therefore negligently and un-

necessarily took the chance of coming too closely to-
gether so that the car, going at the speed it was going,
grazed the corner of the truck. In the brief on behalf
of the company it is said: "But it all happened in an
instant, in a flash; the car ran on at full speed, and the
collision was so momentary, and so unexpected by
everybody, that the locality of it was with many a
mere guess."

JOHN E. KEHOE and C. LE ROY BROWN, for appel-
lant; JOHN S. LORD, of counsel.

CHARLES M. FOELL, MARVIN E. BARNHART, and EARL
J. WALKER, for appellee.

MR. JUSTICE CHYTRAUS delivered the opinion of the
court.

Appellant presents two main contentions upon the
merits of the case: First, that the evidence shows that
the motorman was not negligent; and second, that by
standing upon the foot-board the decedent was negli-
gent, and that that negligence contributed to occasion
the injury.

The testimony presents two inconsistent states of
fact. If the state of facts developed by the evidence
on the part of the street car company be adopted, then
no negligence on the part of the motorman was shown.
If, on the other hand, the view of the appellee be
adopted, the motorman was too venturesome and neg-
ligently hazarded the safety of his passengers, particu-
larly the safety of those who stood upon the east foot-
board of his car. There was ample room for the jury
to adopt either view and, in our opinion, both the pre-
ponderance of the evidence and the more reasonable
view are to be found with the appellee. The attorneys
for appellant at the beginning of their statement of the
case, referring to decedent, assume and assert: "He
was struck by a passing truck wagon belonging to the
Joseph Stockton Company, the rear end of which was

swung against the side of the car." And later it is asserted: "Upon the evidence of both parties, it is apparent to the point of demonstration that the real cause of the collision was the abrupt swing eastward of the horses just as the car and wagon were abreast of each other." Neither the jury nor the trial judge assented to the view of the facts thus contended for.

The truck driver testified that, "in pulling out [of the rail] to avoid the car that was coming, it [the car] struck the hind stake of the hind end of my wagon." The "hind" end, and the stake upon it, projected two or three feet back of the rear wheels of the truck. Assuming that statement, with other evidence of like tendency, to be the true version of the occurrence, the conclusion is irresistible that by not lessening the speed of the car, but undertaking to pass the truck at full speed, the motorman failed to exercise the care which the law required of him, for the safety of his passengers, and for that reason the car ran so close to the rear of the truck that the boys, one at the first stanchion and the other at the second stanchion of the car, were scraped off from the foot-board. The jury were not without evidence upon which to base a finding that in handling his car the motorman did not exercise that high degree of care which is owing from a carrier to a passenger in his charge. Whether the teamster's version of the occurrence was the true one or not was a question for the jury, and where, as here, there is a sharp conflict of fact and the evidence, taken all together, reasonably sustains the view taken by the jury and the trial judge, we ought not to interfere with their conclusion.

It is contended by appellant that the boy Rietzel was negligent in standing upon the foot-board and that that negligence contributed to his injury. The facts in this case are such that, unquestionably the carrier's —the motorman's—negligence would have resulted in no injury to Rietzel, had he not stood upon the foot-board. Yet that does not dispose of this contention

in appellant's favor.  It still remains to be determined
whether his so standing was negligence.  It has, re-
peatedly, been held by the courts of review that a pas-
senger's standing upon a car in a place such as upon a
step, foot-board or platform, is not negligence *per se*
which bars recovery.  Consolidated Traction Co. v.
Schritter, 222 Ill. 364, 366-7; Alton Light & Traction
Co. v. Oller, 217 Ill. 15; North Chicago St. R. R. Co.
v. Polkey, 203 Ill. 225, 232.  Certainly, the proposition
of its being negligence to stand upon the step or foot-
board of a car is not one in respect of which it can
be said that all reasonable minds will come to one and
the same conclusion, namely, that it is negligence.  That
being so, it is a question of fact for a jury; for, if, upon
a given state of facts, the question be whether a party
has been negligent or not, in his conduct, and the state
of facts is such that all reasonable minds would not
arrive at the same conclusion, then the question is
one for a jury.  In this case we are, furthermore,
obliged to take the view that Rietzel stood upon the
foot-board, not from choice but from necessity, owing
to a condition arising from the failure of the street
car company, a common carrier of passengers, to fur-
nish sufficient cars to accommodate all the passengers
within the car.  There is a sharp conflict in the testi-
mony of the witnesses whether there was any vacant
seat, in the car in question.  The verdict being against
the company we must assume, should it be necessary,
that the jury found the car contained no seat that
could be taken by Rietzel.  Attorneys for appellant
incorrectly state the condition of the record, in their
statement of the case, when they say:  ''There was
some indefinite evidence that certain witnesses saw
no vacant seats and that they thought the car was
pretty well filled.''  We cannot understand how such
statement could be made to this court when, aside
from other evidence tending to show the car was full,
at least two witnesses testified positively that there
were no vacant seats.  The witness Fletcher said:

"At the time I got on the car, there were no unoccu-
pied seats, I had to stand." "At the time I got on, three
or four persons were on the foot-board." "There were
no unoccupied seats on the car at that time nor until
the time of the accident." The witness Maloney said:
"When I got on the car it was filled." "The car was
filled all the way down." Street car companies are
under an imperative public duty, as common carriers
of passengers, to furnish sufficient cars to accommo-
date the travel along their lines. We call to mind
some steam railway cases in which, solely upon the
ground that they were common carriers, that doctrine
was distinctly declared. In Quinn v. I. C. R. R. Co.,
51 Ill. 495, it was held: "A railway company which
fails to furnish comfortable sitting accommodations
for its ordinary number of passengers, or even for an
extraordinary number upon due notice, is certainly
negligent, and should be held to strict accountability."
In O. & M. Ry. Co. v. People, 120 Ill. 200, a petition,
for a writ of mandamus, had been filed to compel the
company to furnish, among other things, a sufficient
number of trains. The company answered that it lacked
the necessary funds. So far as the mandamus pro-
ceeding was concerned, that reply was considered suf-
ficient, but our Supreme Court said: "The matter
thus set up in the answer no more exonerates the com-
pany from the duties which it owes the public than
the inability of one to pay his honest debts would re-
lieve him from his legal liabilities to his creditors."
Other cases holding it to be a failure in the perform-
ance of a public duty for a common carrier to fail
in furnishing sufficient accommodations to passengers
are: C. & A. R. R. Co. v. Flagg, 43 Ill. 364; C. & A.
R. R. Co. v. Randolph, 53 Ill. 510; C. & A. R. R. Co. v
Wilson, 63 Ill. 167; C. &. E. I. R. R. Co. v. Jennings,
190 Ill. 478. This duty to furnish sufficient accommo-
dation being a public duty, common carriers can exon-
erate themselves from liability for failure in that re-
spect only by proof of being prevented by some cause

beyond their control. In the case at bar there was not even an attempt at producing proof to that effect. Both on principle and upon authority the operation of an overcrowded car is, *prima facie*, an act of negligence by a carrier. By such act, according to the verdict of the jury, the carrier prevented Rietzel from obtaining the proper accommodation and obliged him to stand upon the foot-board. Under such circumstances, the street car company is in no position to advance Rietzel's standing upon the foot-board as an act of negligence on his part which, in joint operation with the motorman's negligent handling of the car, produced the injury to Rietzel.

The appellant's contention of contributory negligence is also overcome by another and distinct line of reasoning. The conductor testified that when he collected the fares from the two boys he asked them to step inside and take seats and, as he puts it: "They made no reply whatever," but remained standing upon the foot-board until the accident. Notwithstanding this uncontradicted testimony of the conductor we must regard Rietzel as a passenger and not as a licensee or trespasser. A common carrier for hire who takes a person's money, for his transportation to his destination, thereby accepts him as a passenger. The carrier cannot take and retain the consideration and then repudiate the relation any more than a landlord can accept rent and then deny the existence of the relation of landlord and tenant. We hold that, without any qualification, the relation of passenger and carrier existed between the street car company and Rietzel, at the time he was injured. Assuming for present purposes, without conceding, the correctness of appellant's contention that standing upon the foot-board is an unusual mode or manner of travel upon a street car and that there are certain risks or hazards connected with so traveling, other and different from traveling in a seat within the car, yet, when a carrier accepts the fare of one standing upon the foot-board

and, expressly or tacitly, agrees with him upon such mode or manner of transportation, or knowingly permits him to so travel, the carrier is not absolved from all responsibility for injuries that might happen to such passenger traveling in that manner. Upon no principle of law can a carrier, in such case, be held to be absolved from his duty to safely carry, so far as acts of negligence by the carrier himself are concerned. The taking of such position by a passenger does not operate as a permit from him to allow the carrier to be negligent, in respect to him, the passenger, and to relieve the carrier from all responsibility in that connection. The passenger is still a passenger and entitled to the benefit and protection of the law, as such, against acts of negligence by the carrier himself. The risks and dangers, which a passenger standing upon the foot-board is exposed to, may be regarded as arising from two possible sources or causes, viz.: (1) negligence on the part of the carrier and (2) some other source or cause.

In the case at bar, as already shown, the appellant's negligent act caused the injury. Whether or not that negligent act operated in combination with negligence of a third party is now immaterial. The nature of the occurrence in question is such that if fault were attributable to Rietzel, at all, it would, in this instance, be because of his having contributed, by his mere presence where he was, only to the *result* of the carrier's negligence upon himself. He did not contribute in the negligent act which occasioned or was the cause of the unfortunate accident and produced the injury of himself and his companion. Rietzel's position on the car had no tendency to induce the motorman to so handle his car as to hazard passing the truck without accident when he should have run no such risk. Dr. Bishop, in one of his excellent works, says: "If, while one is negligent—perhaps the expression should be, in a state of negligence—another negligently employs an independent force, which, availing itself of the occa-

sion afforded by the former's negligence, works a harm
not its natural and probable consequence, but an inde-
pendent harm, the first negligence is not contributory
to the second." Bishop Non-Contract Law, sec. 463.
The harm worked, in the present instance, was not a
natural and probable consequence of Rietzel's act in
standing upon the foot-board. Rietzel had a right to
suppose and assume, as he stood upon the foot-board,
that the street car company would in nowise be negli-
gent so as to injure him. A passenger need not antici-
pate negligence on the part of his carrier and govern
his acts and conduct upon the theory that the carrier
may be negligent. It was the street car company's
duty to exercise the highest degree of care and cau-
tion, consistent with the practical operation of its road,
for the safety of Rietzel, its passenger, no matter
where he stood. In this respect the company failed.
If a common carrier carries a passenger, for hire, by
some means or in a mode other than usual, its general
responsibility for safe carriage is not thereby other-
wise relaxed than as may be incidental to or connected
with the means or mode. C. & A. R. R. Co. v. Arnol,
144 Ill. 261, 271. Negligence on the part of the car-
rier himself can be an incident to no means or mode
of travel. Public policy forbids exoneration from its
acts of negligence by a carrier; even to the extent that
carriers are prohibited from protecting themselves
against their own negligence by contract. Individuals,
even outside of the relation of passenger and carrier,
are not obliged to anticipate negligence in others and
govern their movements by such rule. Chicago City
Railway Co. v. Fennimore, 199 Ill. 9, 17. Ernst v.
Hudson R. R. Co., 35 N. Y. 9, 28, 35, was a suit brought
against the railroad company for negligently causing
the death of a person at a crossing and the defense
of contributory negligence was interposed. In that
case, although the relation of passenger and carrier
did not exist, the court held that the decedent had a
right to assume that in propelling their cars the rail-

road company would act with appropriate care. By so holding, the court held that acting upon that assumption was not negligence on the part of the decedent and, consequently, that there was no contributory negligence. To the same effect are: Harpell v. Curtis, 1 E. D. Smith, 78, and Newson v. N. Y. Cent. R. R. Co., 29 N. Y. 383. In the latter case the court said (p. 390): "The law will never hold it imprudent in any one to act upon the presumption that another, by his conduct, will act in accordance with the rights and duties of both".

When Rietzel, willing to endure the discomfort and inconvenience of standing upon the foot-board and willing to risk the danger of injury, there, from causes other than the company's negligence, which the law did not require him to risk, in order to be able to reach his destination took standing room upon the foot-board and the company took his fare and suffered him to remain there, then that mode of travel was mutually agreed upon. A formal or perfunctory protest by the conductor made no difference in the relation, between Rietzel and the street car company. By occupying that place, as a passenger, Rietzel did not, for he could not, contract to discharge the company from the duty not to occasion him injury by its own acts of negligent operation of its car. It may be that a passenger, by taking an unusual place, risks certain hazards inherent and obvious to the place or position, such as the danger, in this case, of Rietzel losing his hold upon the angle bar, but danger from negligence by the carrier is not one of those hazards.

Standing upon the foot-board did not cause, or cooperate with, the negligent act of the street car company, or with any act of the truck driver, to occasion or bring about the occurrence as a result of which decedent and his companion were injured. There was no duty on the part of the boys injured to refrain from standing upon the foot-board on the ground that they should, in the exercise of ordinary

care, have anticipated the negligent act of the carrier, and, by not being on the foot-board, have avoided injury therefrom; and, therefore, they did not, in that regard, fail in any duty to exercise ordinary care. For these reasons we hold that there was no negligence on the part of the boys, on the occasion in question, and, consequently, no contributory negligence.

Had Rietzel suffered injury from some other source or cause than through negligence of the street car company itself, then a different question would have arisen, which we need not consider now.

The question whether the truck or the street car had the right of way, discussed by the attorneys for appellant, is totally foreign to the present controversy. The present controversy is solely one between the street car company and the administrator of Rietzel, its passenger, not between it and the driver or owner of the truck.

Complaint is made, also, that the learned trial judge erred in holding, during the cross-examination of the plaintiff's witness Fletcher, one of the passengers on the car, that if appellant's attorney wished to impeach the witness, by proving previous statements inconsistent with the witness' present testimony, he must, in putting the questions relative to the previous statements, embody the precise questions and answers previously put and made, that is, use the precise language used at the previous time or occasion involved. Such ruling was undoubtedly inadvertent, and it was erroneous. Our Supreme Court long since held (Marshall v. Adams, 11 Ill. 41), and it has ever since been the practice when the foundation is being laid, for impeaching a witness, by showing that on some previous occasion he has made some statement at variance with what he is testifying, that it is sufficient if the question purports to give but the substance of the witness' previous statement. The rule is that the witness' attention must be called to the subject-matter of the previous statement and to the

time of the previous occasion. The reason for the rule is satisfied if sufficient, in substance, be given to so call the witness' attention to the previous statement that the witness can admit or deny having made the statement. If there be a denial the trial judge can, and must, then exclude the previous statement when offered, if it does not fairly and substantially correspond with the previous statement embodied in the question asked. But, so far as we can see, the error was harmless. Inspection of what transpired, when the ruling was made, shows that the precise subject-matter involved in the proposed impeachment was not of itself of the most serious importance and that it had not of itself a bearing, directly, upon any of the direct issues in the testimony. It bore, rather, upon the power or possibility of observation and the recollection of the witness. Furthermore, the question was, in substance, whether, at a previous trial, the witness had answered: "I lost sight of them [the approaching horses] for a little while and then I saw them coming toward the southeast". The examiner desired a categorical answer but the witness persisted in attempting to reply by answering what in fact happened, according to his view, at the time of the occurrence. The witness did, however, at one time, in answer to one of numerous repetitions of the question, reply: "I saw them all the way until we struck them. There was a moment or two, there, when they were lost sight of, when they were directly on the track—directly ahead of us". This was, substantially, a repetition and reassertion of the supposed inconsistent and variant statement imputed to the witness in the question asked by the examining attorney. Such being the witness' present testimony, the imputed previous statement, being consistent therewith, became immaterial and the ruling, apparently made to terminate a long drawn out repetition of the same question, affirmatively appears not to be prejudicial. Upon this record it is manifest that no improper result fol-

lowed the erroneous ruling and it is not reasonable
to suppose that the error affected the result. And,
furthermore, assuming there were room for contra-
diction, the attorney for appellant did not follow up
the question with the production of any former con-
tradictory statement by the witness. We cannot, in
order to make the ruling appear materially erro-
neous, assume that there was any previous contradic-
tory statement. "To induce the granting of a new
trial [upon review], there should be strong probable
grounds to believe that the merits of the case have not
been fully and fairly tried, and *that injustice has been
done*". Wheeler v. Shields, 2 Scam. 348, 351. This
decision was rendered in 1840 and such has been the
rule ever since. We find no instance where our Su-
preme Court has overruled this case because not stat-
ing the correct rule. No legislative enactment that
we are aware of has changed the rule. In Deigh v.
Hodges, 3 Scam. 14, 18, our Supreme Court said:
"Sitting, as the Circuit Court was, in disposing of
this motion for a new trial, we are only to ascertain
if, upon the whole case as presented, substantial jus-
tice has been done. It does not always follow that a
new trial will be granted, even if the jury find against
the weight of evidence, against the instructions of the
court or through misdirection of the court on a point
of law, provided the court is satisfied that justice has
been done". In Newkirk v. Cone, 18 Ill. 449, 454, our
Supreme Court expressed itself in this connection as
follows: "* * * We can discover, upon the whole
case, no error in law, in legal effect, prejudicial to the
defendant, and which, upon this record, entitles him
to a reversal of the judgment. Evidently substantial
justice has been done between these parties, and the
defendant has no just cause of complaint. And in
such case, this court will not reverse a judgment, even
if errors have been committed, by the court below,
upon the trial, in the admission or exclusion of evi-
dence, or in the giving or refusing of instructions".
The same doctrine has been announced by our Su-

preme Court in numerous other later cases, among others in Chicago v. Jackson, 196 Ill. 496, 511. Upon the merits of the case at bar, so far as appellant is concerned, substantial justice appears to have been done.

The complaint made of the giving of an instruction, conceded to be correct in the abstract, we have considered and find it to be totally without merit.

It is urged upon us that there is error in this record because no action has ever been taken by the trial court upon the verdict of the jury, returned in the first trial of this case, in so far as it was in favor of the Joseph Stockton & Company. There was error in the procedure of the court in that respect. In this particular case, however, there are two reasons why the present judgment should not be disturbed because of that error. In the first place the Railway Company appealed from the judgment then rendered and, so far as we can see, failed to raise the question of that error at that time. A party cannot be permitted, upon taking an appeal, to refrain from raising an error then existent upon the record and hold it in reserve to be raised upon a future appeal. By not raising the question of that error upon the former appeal and by going to trial, when the judgment now before us was rendered, without raising the question in the trial court, appellant has waived that error. In the second place this is a tort action and such an one that there would be no right of contribution. It has been held that, in such case, taking judgment against one, upon a declaration charging joint negligence with others is but an irregularity and amounts to a dismissal of a defendant against whom the judgment is not taken. Such procedure is not sufficient ground for reversal. Postal Telegraph-Cable Co. v. Likes, 225 Ill. 249, 265; Davis v. Taylor, 41 Ill. 405, 408.

The judgment of the Superior Court will be affirmed.

*Affirmed.*